UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

JUSTIN SANFORD, #754750,

        Petitioner,

                                  CASE NO. 5:13-CV-14711

v.                                HON. JOHN CORBETT O'MEARA

CINDI CURTIN,

        Respondent.

_____/

**OPINION & ORDER DENYING THE PETITION FOR A WRIT OF
HABEAS CORPUS, DENYING A CERTIFICATE OF APPEALABILITY,
AND DENYING LEAVE TO PROCEED IN FORMA PAUPERIS ON APPEAL**

## I.    Introduction

      This is a habeas case brought pursuant to 28 U.S.C. § 2254. Michigan prisoner Justin Sanford ("petitioner") was convicted of assault with intent to rob while armed, MICH. COMP. LAWS § 750.89, conspiracy to commit armed robbery, MICH. COMP. LAWS § 750.157a; MICH. COMP. LAWS § 750.529, first-degree home invasion, MICH. COMP. LAWS § 750.110a(2), and conspiracy to commit home invasion, MICH. COMP. LAWS § 750.157a; MICH. COMP. LAWS § 750.11a(2), in the Oakland County Circuit Court in 2010. He was sentenced to 15 to 30 years imprisonment on the assault and armed robbery conspiracy convictions and to 13 to 20 years imprisonment on the home invasion and home invasion conspiracy convictions. In his pleadings, the petitioner raises claims concerning the sufficiency of the evidence and the validity of his sentence. For the reasons set forth, the court finds that those claims lack merit and denies the petition for a writ of habeas corpus. The court also denies a certificate of appealability and denies leave to proceed in forma pauperis on appeal.

## II.    Facts and Procedural History

The petitioner's convictions arise from a home invasion in Royal Oak, Michigan on January

25, 2010.  The Michigan Court of Appeals provided a factual summary, which is presumed correct

on habeas review.  *Monroe v. Smith*, 197 F. Supp. 2d 753, 758 (E.D. Mich. 2001), *aff'd*,  41 F.

App'x 730 (6th Cir. 2002).  Those facts are as follows:

> This case arises out of an incident that occurred on January 25, 2010. According to
> the testimony of Darius Lewis, on January 25, 2010, he was at a friend's house
> playing cards when he received a telephone call from defendant Donte Leonard.
> Leonard asked Lewis to come to a strip club called "Cheetah's" and get him so that
> they could "hit this lick," which Lewis understood to mean rob someone.Lewis, who
> was wearing a red sweater, a red hat, and black pants, drove his red Grand Prix to
> Cheetah's. Leonard was waiting outside in the parking lot. Leonard got into the car
> and said that they were "about [to] hit a lick on a stripper." Lewis also saw
> defendants Kyle Lester and Justin Sanford. Lewis testified that another individual,
> Jayson Holt, also came out of the strip club.
>
> Lewis testified that he and Leonard were in the red Grand Prix and the others
> (Sanford, Lester, and Holt) were in a green Impala. Sanford was in the driver's
> seat of the Impala, Lester was in the front passenger seat, and Holt was in the backseat.
> Lewis testified that they then waited for a woman to come out of the club.
> Apparently, the woman got into what Lewis described as a beige Tahoe. Lewis did
> not actually see the Tahoe or the Impala leave, but he believed that the Impala
> followed the Tahoe because Holt then called Leonard, who directed Lewis to catch
> up with the other vehicle. Once Lewis caught up on Dorchester Street, he pulled up
> in front of a house behind the green Impala. Lewis saw the beige-colored Tahoe and
> saw a woman "closing the door." FN5
>
> FN5. The record is unclear whether she was closing the door of the vehicle or the
> door of her house.
>
> Leonard got out of Lewis's car and got into the Impala. The Impala then turned
> around and parked on the corner. Lewis followed suit, and turned around too. Lester,
> Holt, Sanford, and Leonard got out of the Impala, and Lewis got out of his car. Lewis
> testified that "they was ready to go." Leonard had a gray gun, and Holt had a black
> gun. Lewis did not see Sanford or Lester with guns. Lewis testified, "We wasn't
> going to go in, then [Holt] said, 'Come on. We're going in [apparently referring to
> the house belonging to the woman who drove the Tahoe].' I'm, like, 'I ain't going.'
> " Lewis did not know if anyone else said "no," but he was the only one who turned
> around. Lewis testified that after he turned around, he went back to his car.

Lewis testified that the other four men, who all had masks on, then started to walk toward the house. Leonard and Holt went toward the back of the house, and Lester and Sanford walked toward the front of the house. Lewis got into his car, and as he was passing the house, he saw the police coming toward him. Lewis also heard the door to the house (608 Dorchester) being kicked in and heard, "Get down." Lewis did not see who kicked the door in, but he saw Lester standing on the grass near the street. Lewis never saw anyone actually enter the house or leave the house. The police then stopped and arrested Lewis.

Lewis testified that no one had promised him anything in exchange for his testimony. Lewis testified that he was charged with unarmed robbery and conspiracy to commit unarmed robbery. He testified that his charges were still pending at that time. (According to Leonard's PSIR, Lewis later pleaded guilty to those offenses.)

Jennifer Locke testified that on the evening of January 24, 2010, and going into January 25, 2010, she was working her shift as a hostess at Cheetah's. Sanford, who had been at the club a couple times before that night, was there. According to Locke, Sanford repeatedly asked her where she lived and asked for her phone number, but Locke did not give him either. She testified that Sanford was with other people, but she did not pay attention to them. Locke saw Sanford leave, but she did not pay attention to whether he left with anyone.

Locke left work at approximately 2:30 a.m. and proceeded to drive home. She was driving a tan 2001 Suburban. Before exiting I–75 onto Eleven Mile Road, Locke noticed a dark car next to her, but she was not concerned about it. But Locke noticed that as she turned down a street, the dark car turned on the next street. Then, when Locke was getting ready to turn onto her block, she saw the car again with its headlights off. As Locke pulled into her driveway, she saw the dark car drive past her house, still with its headlights off. As she got out of her car and headed to the front door of her house, she then saw a red car pull up in front of her house. The dark car had parked two houses down the street. At that point, Locke hurried to get into her house. As Locke was entering the house, she saw a black male wearing gray sweatpants and a white t-shirt get out of the passenger side of the red car. When the interior lights of the red car came on, Locke could see that the driver was wearing dark clothing. On cross-examination, she testified that the driver was "bigger."

Inside the house were Locke's two youngest children, who were five and six years old, and the babysitter, Tonya Brown. Locke woke up Brown and told her that she thought someone had followed her home. Locke and Brown then looked out the window to "see if they'll [the men] go away." Locke saw the passenger from the red car talking to whoever was in the other dark car. The talk lasted for a minute and a half or two minutes. Locke then saw two men start to walk up to her house. One of the men was the man who had gotten out of the red car. Then, according to Locke, they turned around. They got back in the dark car, and the dark car turned around and parked on the corner. Locke believed that the red car moved as well, but was not

certain. Locke thought they had left, so she opened her front door, but she then heard two doors, presumably car doors, slam. At that point, Locke saw two black men approaching her house, so she grabbed her children, hid in a closet, and called 911. Locke could not tell if these two men were the same ones she had seen before. At the same time, Brown ran into the bathroom and shut the door.

Locke heard a door break in and heard someone yell, "ATF. Get the [F* * *] down." Brown similarly testified that she heard two voices yelling, "ATF. Police. Get down." Locke heard more than one person, but she did not know if more than one person yelled. Locke heard someone upstairs. Brown heard someone downstairs and heard someone go upstairs. Locke, who was terrified, remained on the phone with 911. According to Locke, the people were in the house for no longer than two minutes. Not long after hearing the people in the house, Brown saw police lights outside the bathroom window and saw an officer standing there, so she came out of the bathroom. Locke came out of the closet when she heard a police officer in her house. Locke heard the officers less than one minute after the men left.

Locke's purse and Brown's purse were missing, and Locke's laptop, which had been upstairs, was found downstairs on the kitchen floor. Both women's purses were returned, and nothing was missing from either purse.

At some point, Locke went with an officer to a police car that was parked in front of her house. Locke recognized the person seated in the back of the police car as Sanford because he had been in the club that night. Locke was unable to identify a person seated in another police car. Locke was unable to say whether she saw Leonard or Lester that night. Locke testified that she saw a person wearing a red sweatshirt or sweater, but it was unclear from her testimony which person she was referring to, and she never identified that individual at the scene. Locke never saw a gun that evening. Locke was unable to say for certain how many people were in the cars or were involved. Locke testified that there were more than two people in front of her house. On redirect examination, Locke testified that two doors had been broken in or forced open at the same time.

At approximately 3:00 a.m. on January 25, 2010, Officer Patrick Schneider received information via dispatch regarding suspicious circumstances at 608 Dorchester. As he was driving toward the location, he received information that there were four black males kicking in the front door at that address. As he turned onto Dorchester, he saw a vehicle coming toward him. Officer Schneider used his spotlight to illuminate the driver and saw one black male with no passengers. Officer Schneider then used his overhead lights to stop the vehicle. The car was a red 1997 Pontiac Grand Prix driven by Lewis. Lewis was wearing a red sweatshirt or shirt, a ball cap, and charcoal-gray sweat pants.

Officer Lindsay Bowen also received a dispatch about a 911 call from 608 Dorchester on January 25, 2010. Someone had followed the caller home and was

kicking in the door. The suspect vehicles were believed to be a red sedan and a black Monte Carlo. Officer Bowen saw a dark-colored Chevy Impala parked on Farnum, east of North Dorchester. She pulled up behind the vehicle, put the spotlight on the vehicle, and walked up to the driver's side. No one was inside the vehicle. As she was looking in the driver's side, a black male, whom she identified as Sanford, was walking toward her. Officer Bowen ordered him to come to the car and put his hands on the hood. Sanford said that it was his vehicle. She detained him and placed him in the back of her patrol car. She then turned him over to Officer Kenneth Spencer. She believed that Sanford was wearing a dark-colored hoodie, but was not certain.

Officer Spencer also received a dispatch regarding 608 North Dorchester on January 25, 2010. He parked a few houses down, walked toward the address, and heard a female voice screaming from inside the house. He began running toward the house, and two other officers began entering the house. Officer Spencer learned that four males had fled the house out the side door, so he went to the side door. The door was open, and there were muddy boot prints or scuff marks on the door. It appeared that the door had been kicked in, and there was damage to the door frame. He also saw mud and wetness on the threshold going into the kitchen. He saw one clear wet boot print going into the house on the concrete threshold. Officer Spencer testified that the boot pattern in People's Proposed Exhibit 17 was similar to the print he saw. (People's Proposed Exhibit 17 was later identified as a photograph of the bottom of Lester's boots.) Officer Spencer heard a neighbor yell that he had heard the noise and saw someone jump the fence into his yard and travel east. Officer Spencer went to the front of the house and met Officer Bowen, who indicated that she had stopped a black male. Officer Spencer looked inside the dark green Chevy Impala and saw a fresh, muddy boot print on the passenger floorboard that "matched exactly" the print he had seen on the threshold. Officer Spencer testified that the person he took from Officer Bowen's car was Sanford. Officer Spencer patted down Sanford and felt a soft object in his front pocket; Sanford said the object was his hat. However, during booking, Officer Spencer discovered that it was a cold-weather mask.

Sergeant David Szlezyngier was also dispatched to 608 North Dorchester on January 25, 2010. Sergeant Szlezyngier tried to photograph the side entry of 608 North Dorchester, but did not see any footprints on the ground. He also photographed the front passenger floorboard of a car where the police had located a suspect. After viewing a photograph of the soles of Lester's boots, Sergeant Szlezyngier testified that the pattern on the floorboard was similar to the pattern on Lester's boots. He believed they were a match. Sergeant Szlezyngier also testified that he found a cell phone on the fence line, across from the side door of the house.

When Officer David Koehler, a Madison Heights police officer with the K9 unit, arrived at the residence on 608 Dorchester, he was told that the suspects fled out the side door and through the backyard. Officer Koehler's dog picked up a track and went through the backyard. The dog went through the gate and into a park behind the house. The dog eventually led the officer to the front of the houses on Symes Avenue

and alerted on something underneath some bushes in front of a house. The police found hand guns covered up lightly with leaves underneath the bush in the front yard of 607 Symes.

Officer Lawrence Fajardo took the guns that were recovered into evidence. One of the guns was a black "Glock, model 19, nine-millimeter handgun." Another was a silver "Ruger forty-caliber semi-automatic hand gun." Officer Fajardo also recovered two purses from behind the local baseball field.

Because two African American male suspects from the incident were still outstanding, Officer Andrew Izydorek and Officer Crane set up surveillance outside 607 Symes in order to locate the suspects if they returned for the guns. The officers were in unmarked vehicles for several hours. At approximately 12:00 p.m., a vehicle turned onto Symes and was driving very slowly. As the vehicle passed Officer Izydorek's vehicle, he could see that it was a green Pontiac with four African Americans inside. The driver was an African American female. Officer Crane followed the Pontiac and told Officer Izydorek that the two backseat passengers had gotten out of the vehicle. Officer Crane indicated that he was going to follow the two passengers who had exited.

The Pontiac drove by Officer Izydorek again, and there were only two people inside. Officer Izydorek lost sight of the vehicle, but then saw it going west on Farnum, past Symes, and then lost sight of it again. At that time it was too far away for Officer Izydorek to see how many people were in the car. But approximately 30 seconds later, Officer Izydorek saw a young African American male walking east on Farnum and turn north on Symes. As the man got near 607 Symes, he slowed his walk and stared intently at the house, but he continued to walk by the house. The man walked up to Officer Izydorek's vehicle and tried looking inside. Officer Izydorek was lying down in his vehicle. The man walked past the vehicle, looked like he was talking on his cell phone, turned around, and started walking south. The man looked into Officer Izydorek's vehicle again as he passed. The man then started to walk up the driveway of 607 Symes. Officer Izydorek then saw the man get on his hands and knees and started digging into the bush where the guns had been located. Officer Izydorek identified the man as Leonard.

After Leonard got back up, Officer Izydorek pulled up, turned his flashers on, and Leonard started running toward Farnum. Officer Izydorek followed him in his vehicle, and Leonard ran toward the Pontiac. The Pontiac was parked with the front passenger door open. Officer Izydorek turned his siren on, and vehicle drove off. Leonard continued to run, and when he slid on ice, Officer Izydorek was able to take him into custody. The police also detained the driver of the Pontiac and the other two individuals who had gotten out of the vehicle.

At approximately 12:00 p.m. on January 25, 2010, Officer Kevin Isaacson was working patrol with Officer Hendry. Officer Crane stated via radio that two black

males were let off at the intersection of Forest and Stephenson. Officer Isaacson and Officer Hendry responded to the area and saw two black males at the intersection of Gardenia and Stephenson. The officers stopped the individuals. Officer Isaacson identified Lester as one of the individuals. Officer Isaacson identified People's Proposed Exhibit 42 as the boots that Lester was wearing.FN6 The other individual was identified as Holt.

FN6. However, previously, the prosecution stated that People's Exhibit 42 were photographs of the soles of Lester's boots.

According to the testimony of William Foreman, he worked in the Latent Print Unit and Crime Scene Unit of the Oakland County Sheriff's Forensic Science Laboratory. He processed three vehicles that were in the possession of the Royal Oak Police Department, looking for fingerprints and collecting evidence. He also examined hand guns and a cell phone for fingerprints. Foreman testified that he found nothing in the green Pontiac. In the red Grand Prix, there were disposable cameras and a handwritten map in the trunk. In the green Impala there were two shotgun shells in the glove box; a folding knife and a blue bandana in the center console; green plant material between the front seats; and two black knit caps, a social club invitation, and green plant material in the trunk. He found no identifiable fingerprints in the vehicles, on the hand guns, or on the cell phone.

The trial court ordered two separate juries, one for Lester, and one for Sanford and Leonard. A joint trial of all three codefendants began on August 31, 2010.

After the prosecution rested, Leonard moved for a directed verdict on the charge of assault with intent to commit robbery while armed, Lester asked that the trial court dismiss all four counts, and Sanford moved for a directed verdict on the charges. The trial court denied all three motions.

All three defendants rested. The jury found all three defendants guilty of all four offenses as charged.

*People v. Sanford*, No. 300852, 2012 WL 975030, *1-6 (Mich. Ct. App. March 22, 2012) (unpublished).

Following his conviction and sentencing, the petitioner filed an appeal of right with the Michigan Court of Appeals raising several claims, including the same claims presented on habeas review. The court denied relief on those claims and affirmed his convictions and sentence. *Id.* at *8-10, 13-15. The petitioner filed an application for leave to appeal with the Michigan Supreme

Court, which was denied in a standard order. *People v. Sanford*, 492 Mich. 867, 819 N.W.2d 879 (2012). The court also denied reconsideration. *People v. Sanford*, 493 Mich. 943, 826 N.W.2d 717 (2013).

The petitioner thereafter filed his federal habeas petition raising the following claims:

I.      Due process mandates that a sentence be based only on accurate information.

II.     Insufficient evidence for the assault with intent to rob while armed.

The respondent has filed an answer to the petition contending that it should be denied for lack of merit.

## III.    Standard of Review

The Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), codified 28 U.S.C. § 2241 *et seq.*, provides the standard of review for federal habeas cases brought by state prisoners. The AEDPA provides:

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim--
>
> (1)     resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2)     resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

28 U.S.C. §2254(d) (1996).

 "A state court's decision is 'contrary to' . . . clearly established law if it 'applies a rule that contradicts the governing law set forth in [Supreme Court cases]' or if it 'confronts a set of facts that are materially indistinguishable from a decision of [the Supreme] Court and nevertheless arrives at a result different from [that] precedent.'" *Mitchell v. Esparza*, 540 U.S. 12, 15-16 (2003)

8

(per curiam) (quoting *Williams v. Taylor*, 529 U.S. 362, 405-06 (2000)); *see also Bell v. Cone*, 535 U.S. 685, 694 (2002).

"[T]he 'unreasonable application' prong of § 2254(d)(1) permits a federal habeas court to 'grant the writ if the state court identifies the correct governing legal principle from [the Supreme] Court but unreasonably applies that principle to the facts of petitioner's case." *Wiggins v. Smith*, 539 U.S. 510, 520 (2003) (quoting *Williams*, 529 U.S. at 413); *see also Bell*, 535 U.S. at 694. However, "[i]n order for a federal court to find a state court's application of [Supreme Court] precedent 'unreasonable,' the state court's decision must have been more than incorrect or erroneous. The state court's application must have been 'objectively unreasonable.'" *Wiggins*, 539 U.S. at 520-21 (citations omitted); *see also Williams*, 529 U.S. at 409. "AEDPA thus imposes a 'highly deferential standard for evaluating state-court rulings,' and 'demands that state-court decisions be given the benefit of the doubt.'" *Renico v. Lett*, 559 U.S. 766, 773 (2010) (quoting *Lindh*, 521 U.S. at 333, n. 7; *Woodford v. Viscotti*, 537 U.S. 19, 24 (2002) (per curiam)).

The United States Supreme Court has held that "a state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Harrington v. Richter*, _ U.S. _, 131 S. Ct. 770, 786 (2011) (citing *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). The Supreme Court emphasized "that even a strong case for relief does not mean the state court's contrary conclusion was unreasonable." *Id.* (citing *Lockyer v. Andrade,* 538 U.S. 63, 75 (2003). Pursuant to § 2254(d), "a habeas court must determine what arguments or theories supported or . . . could have supported, the state court's decision; and then it must ask whether it is possible fairminded jurists could disagree that those arguments or theories are inconsistent with the holding in a prior decision" of the Supreme Court. *Id.* Thus, in order to obtain federal habeas relief, a state prisoner must show

9

that the state court's rejection of his claim "was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement." *Id.*

Section 2254(d)(1) limits a federal habeas court's review to a determination of whether the state court's decision comports with clearly established federal law as determined by the Supreme Court at the time the state court renders its decision. *Williams*, 529 U.S. at 412; *see also Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) (noting that the Supreme Court "has held on numerous occasions that it is not 'an unreasonable application of clearly established Federal law' for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Lockyer v. Andrade*, 538 U.S. 63, 71-72 (2003). Section 2254(d) "does not require a state court to give reasons before its decision can be deemed to have been 'adjudicated on the merits.'" *Harrington*, 131 S. Ct. at 785. Furthermore, it "does not require citation of [Supreme Court] cases–indeed, it does not even require *awareness* of [Supreme Court] cases, so long as neither the reasoning nor the result of the state-court decision contradicts them." *Early v. Packer*, 537 U.S. 3, 8 (2002); *see also Mitchell*, 540 U.S. at 16. While the requirements of "clearly established law" are to be determined solely by Supreme Court precedent, the decisions of lower federal courts may be useful in assessing the reasonableness of the state court's resolution of an issue. *Stewart v. Erwin*, 503 F.3d 488, 493 (6th Cir. 2007) (citing *Williams v. Bowersox*, 340 F.3d 667, 671 (8th Cir. 2003)); *Dickens v. Jones*, 203 F. Supp. 354, 359 (E.D. Mich. 2002).

Lastly, a state court's factual determinations are presumed correct on federal habeas review. *See* 28 U.S.C. § 2254(e)(1). A petitioner may rebut this presumption with clear and convincing evidence. *Warren v. Smith*, 161 F.3d 358, 360-61 (6th Cir. 1998). Moreover, habeas review is

10

"limited to the record that was before the state court." *Cullen v. Pinholster*, _ U.S. _, 131 S. Ct. 1388, 1398 (2011).

## IV.   Analysis

### A.   Insufficient Evidence Claim

The petitioner asserts that he is entitled to habeas relief because the prosecution failed to present sufficient evidence to support his conviction for assault with intent to rob while armed. In particular, he claims that the prosecution failed to establish that he was one of the people who entered the home. The respondent contend that this claim lacks merit.

The federal due process clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is charged." *In re Winship*, 397 U.S. 358, 364 (1970). The question on a sufficiency of the evidence claim is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979).

A federal habeas court views this standard through the framework of 28 U.S.C. § 2254(d). *Martin v. Mitchell*, 280 F.3d 594, 617 (6th Cir. 2002). Under the AEDPA, challenges to the sufficiency of the evidence "must survive two layers of deference to groups who might view facts differently" than a reviewing court on habeas review – the factfinder at trial and the state court on appellate review – as long as those determinations are reasonable. *Brown v. Konteh*, 567 F.3d 191, 205 (6th Cir. 2009). The *Jackson* standard must also be applied "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Jackson*, 443 U.S. at 324 n.16. "A reviewing court does not re-weigh the evidence or re-determine the credibility of the witnesses whose demeanor has been observed by the trial court." *Matthews v. Abramajtys*, 319

11

F.3d 780, 788 (6th Cir. 2003) (citing *Marshall v. Lonberger*, 459 U.S. 422, 434 (1983)). "The mere existence of sufficient evidence to convict therefore defeats a petitioner's claim." *Id.* at 788-89 (citation omitted).

> Michigan law defines the crime of assault with intent to rob while armed as follows:
>
> Assault with intent to rob and steal being armed—Any person, being armed with a dangerous weapon, or any article used or fashioned in a manner to lead a person so assaulted reasonably to believe it to be a dangerous weapon, who shall assault another with intent to rob and steal shall be guilty of a felony, punishable by imprisonment in the state prison for life, or for any term of years.

MICH. COMP. LAWS § 750.89. The elements of the offense are: (1) an assault, (2) an attempt to rob, (3) while armed. *People v. Akins*, 259 Mich. App. 545, 554, 675 N.W.2d 863, 873 (2003).

To convict a defendant under an aiding and abetting theory, the prosecution must establish that the crime was committed by the defendant or some other person, that the defendant performed acts or gave encouragement that aided or assisted in the commission of the crime, and that the defendant either intended to commit the crime or knew that the principal intended to commit the crime at the time he or she gave the aid or encouragement. *People v. Carines*, 460 Mich. 750, 757-58, 597 N.W.2d 130 (1999); *see also People v. Moore*, 470 Mich. 56, 679 N.W.2d 41, 49 (2004); MICH. COMP. LAWS § 767.39. An aider and abettor's state of mind may be inferred from all the facts and circumstances, including a close association between the defendant and the principal, the defendant's participation in the planning or execution of the crime, and evidence of flight after the crime. *Carines*, 460 Mich. at 757-58.

The prosecution must prove every element of a charged offense beyond a reasonable doubt. This burden includes proving that the defendant is the person who committed the charged crime. *People v. Oliphant*, 399 Mich. 472, 489, 250 N.W.2d 443, 449 (1976); *People v. Kern*, 6 Mich. App. 406, 409, 149 N.W.2d 216, 218 (1967). In other words, "proof of [the] defendant's

connection with the alleged offense is an indispensable element of [the prosecutor's] duty." *Kern, supra*. Direct or circumstantial evidence and reasonable inferences arising from that evidence may constitute satisfactory proof of the elements of an offense, *People v. Nowack*, 462 Mich. 392, 399-400, 614 N.W.2d 78, 81 (2000); *People v. Jolly*, 442 Mich. 458, 466, 502 N.W.2d 177, 180 (1993), including the identity of the perpetrator, *Dell v. Straub*, 194 F. Supp. 2d 629, 647 (E.D. Mich. 2002); *People v. Johnson*, 146 Mich. App. 429, 434, 381 N.W.2d 740, 742 (1985).

Applying the *Jackson* standard, the Michigan Court of Appeals concluded that the prosecution presented sufficient evidence to support the petitioner's conviction for assault with intent to rob while armed. The court explained in relevant part:

> We conclude that a reasonable trier of fact could find beyond a reasonable doubt that Sanford, Lester, and Leonard committed or aided and abetted in the crime of assault with intent to rob while armed.
>
> First, there was evidence of an assault with force and violence. An assault is defined as either an attempted battery or an unlawful act which places another in reasonable apprehension of receiving an immediate battery. The apprehension-type assault is satisfied when "an actor engages in some form of threatening conduct designed to put another in apprehension of an immediate battery." "[T]he inquiry turns on what the victim perceived, and whether the apprehension of imminent injury was reasonable." In *Reeves*, the Court concluded "that proof of either an apparent or actual present ability to commit a battery is sufficient to satisfy the assault element of" assault with intent to rob while unarmed.
>
> Here, there was testimony that one or more individuals kicked in Locke's door and yelled for everyone to get down. Locke testified that she was terrified. The 911 calls, which were admitted and played at trial, also demonstrated Locke's fear. Lewis testified that he saw the individuals wearing masks, Sanford and Lester walked toward the front of the house, and Leonard and Holt walked toward the back of the house with guns. Lewis heard the door being kicked in and also heard, "Get down." A rational trier of fact could find that the individuals involved committed an unlawful act, breaking into Locke's house, which placed Locke in reasonable apprehension of receiving an immediate battery. Apprehension of an immediate battery is reasonable when the perpetrators kick in the door and command everyone to get down. Moreover, this assault was committed with force and violence because the individuals kicked in the doors and yelled for everyone to get down. The threat of imminent injury has been found sufficient to satisfy the force and violence

13

element of assault with intent to rob while unarmed.

Second, there was evidence that the individuals had the intent to rob or steal from Locke. Lewis testified that Leonard stated that they were going to "hit this lick," and "hit a lick," which Lewis understood to mean rob someone. In addition, Locke's purse and Brown's purse were removed from the house and found in a baseball field. Locke's laptop was also moved from upstairs to downstairs. Thus, it can reasonably be inferred that the intent of the individuals in breaking in was to rob or steal.

Third, there was evidence that Leonard and Holt were armed. Lewis testified that he saw both Leonard and Holt with guns just before he saw them walk toward the back. Guns matching the description given by Lewis were found at 607 Symes. Leonard was apprehended while trying to recover the guns from that location. Thus, it can reasonably be inferred that Leonard and Holt were armed when they entered the house.

Moreover, a reasonable trier of fact could find beyond a reasonable doubt that Sanford, Leonard, and Lester each performed acts or gave encouragement that assisted in the commission of assault with intent to rob while armed. Leonard called Lewis, informing Lewis of the plan. Sanford drove his vehicle, with Lester and Holt inside, and followed Locke to her home. Lewis testified that he believed Holt called Leonard from the other vehicle and directed Leonard and Lewis. Lewis testified that, at Locke's house, he saw Sanford and Lester wearing masks and saw them walk up the street toward the front of the house. Lewis also saw Leonard with a mask and a gun, and saw Leonard walk toward the back of the house. There was also testimony that the print on the boots that Lester was wearing the next day when he was apprehended matched the print going into Locke's house from the side door and on the front door of the house. The print going into the house also matched the one on the floor on the front passenger side of the Impala, where Lewis testified that Lester was sitting. Moreover, Leonard was apprehended while trying to recover the guns the next day. Thus, it can reasonably be inferred that Sanford, Leonard, and Lester each assisted in the assault with intent to rob while armed.

Finally, a reasonable trier of fact could find beyond a reasonable doubt that Sanford, Lester, and Leonard intended the commission of assault with intent to rob while armed or had knowledge that the principal intended its commission at the time he gave aid and encouragement. Lewis testified that when Leonard first called him, Leonard stated that they were going to "hit this lick," or rob someone. According to Locke, that night at Cheetah's Sanford had asked where she lived. Sanford and Lester followed Locke to her home and parked several houses away. Lewis saw Sanford and Lester with a mask, and Sanford also had a mask in his pocket when the police apprehended him. Leonard also wore a mask and had a gun. This evidence shows that when Sanford and Lester provided assistance, they either intended or knew that the other individuals intended to commit assault with intent

14

to rob while armed. It can reasonably be inferred that Sanford and Lester were
aware that Leonard and Holt had weapons when they followed Locke to her house.
Furthermore, after all the individuals got out of the cars, Lewis saw that Leonard
and Holt had weapons. Thus, it can reasonably be inferred that Sanford and Lester
saw the weapons at that point and knew Leonard and Holt were armed when they
entered the house.

Alternatively, Sanford, Lester, and Leonard are guilty of assault with intent to rob
while armed because assault with intent to rob while armed was a natural and
probable consequence of the armed robbery, which they intended to aid and abet.
As discussed above, it can reasonably be inferred that Sanford and Lester intended
to assist in the robbery of Locke and were aware that Leonard and Holt were armed.
An assault with intent to rob while armed "'might be expected to happen if the
occasion should arise'" during the commission of armed robbery.

*Sanford*, 2012 WL 975030 at *8-10 (footnotes omitted).

Having reviewed the record, the court finds that the Michigan Court of Appeals'

determination is neither contrary to Supreme Court precedent nor an unreasonable application of

federal law or the facts.  The prosecution presented sufficient evidence to establish the petitioner's

guilt of assault with intent to rob while armed as a principal or as an aider and abettor.  The

testimony of the victim, Jennifer Locke, and the testimony of Darius Lewis established that the

petitioner was at the club where the victim worked on the night of the crime and asked her where

she lived, that the petitioner and the co-defendants intended to rob her, that the petitioner drove one

of the cars that followed the victim to her house, that the men wore masks and two of them were

armed, that the petitioner went to the victim's door and/or entered her house, that someone kicked

the door in and yelled, "Get down," and that the victim's laptop was moved and two purses were

taken from her home (and found in a nearby baseball field).  The police testimony established that

the petitioner was detained near the scene shortly after the incident and that a mask was found on

his person.  The police testimony also established that a dog unit led them to a nearby residence

where they found guns in the bushes and then observed one of the co-defendants digging in that

area after the guns had been confiscated.  Such evidence was sufficient to establish that the petitioner committed the crime of assault with intent to rob while armed either as a principal or as an aider and abettor.

The petitioner challenges the jury's evaluation of the evidence.  However, it is the job of the fact-finder at trial, not a federal habeas court, to resolve evidentiary conflicts.  *Jackson*, 443 U.S. at 326; *Martin v. Mitchell*, 280 F.3d 594, 618 (6th Cir. 2002); *see also Walker v. Engle*, 703 F.2d 959, 969-70 (6th Cir. 1983) ("A federal habeas corpus court faced with a record of historical facts that supports conflicting inferences must presume - even if it does not affirmatively appear in the record - that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.").  The evidence presented at trial, viewed in a light favorable to the prosecution, established beyond a reasonable doubt that the petitioner committed the crime of assault with intent to rob while armed.  The jury's verdict and the Michigan Court of Appeals' decision affirming that verdict were reasonable.  Habeas relief is not warranted.

**B.      Sentencing Claim**

The petitioner asserts that he is entitled to habeas relief because the trial court erred in scoring Offense Variable 14 (leadership role) of the state sentencing guidelines at 10 points such that his sentence is based upon inaccurate information.  The respondent contends that this claim is not cognizable upon habeas review and/or lacks merit.

The Michigan Court of Appeals denied relief on this claim finding that Offense Variable 14 was correctly scored.  The court explained in relevant part:

> In this case, there was evidence to support the trial court's scoring of 10 points for OV 14. According to Locke, Sanford spoke to her at the club that night and tried to find out where she lived. There was also testimony that Sanford was driving the vehicle that followed Locke to her home. Although Sanford did not have a gun, the evidence is sufficient to support the trial court's determination that Sanford was a

16

leader. Therefore, the trial court did not abuse its discretion in scoring 10 points for OV 14.

*Sanford*, 2012 WL 975030 at *14-15.

The state court's decision is neither contrary to Supreme Court precedent nor an unreasonable application of federal law or the facts. As an initial matter, the court notes that the petitioner's sentences of 15 to 30 years imprisonment and 13 to 20 years imprisonment are within the statutory maximum of life imprisonment for his offenses. *See* MICH. COMP. LAWS §§ 750.89; 750.157a; 750.529; 750.110a(2). A sentence within the statutory limits is generally not subject to federal habeas review. *Townsend v. Burke*, 334 U.S. 736, 741 (1948); *Cook v. Stegall*, 56 F. Supp. 2d 788, 797 (E.D. Mich. 1999). Claims which arise out of a state court's sentencing decision are not cognizable upon habeas review unless the petitioner can show that the sentence imposed exceeded the statutory limits or is wholly unauthorized by law. *Lucey v. Lavigne*, 185 F. Supp. 2d 741, 745 (E.D. Mich. 2001). The petitioner makes no such showing.

Moreover, the petitioner's claim that the trial court erred in scoring Offense Variable 14 (leadership role) at 10 points under the state sentencing guidelines is not cognizable on federal habeas review because it is a state law claim. *See Howard v. White*, 76 F. App'x 52, 53 (6th Cir. 2003) ("A state court's alleged misinterpretation of state sentencing guidelines and crediting statutes is a matter of state concern only."); *McPhail v. Renico*, 412 F. Supp. 2d 647, 656 (E.D. Mich. 2006); *Robinson v. Stegall*, 157 F. Supp. 2d 802, 823 (E.D. Mich. 2001). Any error in scoring the offense variables and determining the guideline range does not merit habeas relief. State courts are the final arbiters of state law and the federal courts will not intervene in such matters. *Lewis v. Jeffers*, 497 U.S. 764, 780 (1990); *Oviedo v. Jago*, 809 F.2d 326, 328 (6th Cir. 1987); *see also Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Sanford v. Yukins*, 288 F.3d 855, 860

17

(6th Cir. 2002). Federal habeas relief does not lie for perceived errors of state law. *Estelle v. McGuire*, 502 U.S. 62, 67-68 (1991). The petitioner thus fails to state a claim upon which relief may be granted as to this issue.

The petitioner is also not entitled to habeas relief on any claim that his sentence is based upon inaccurate information. A sentence may violate federal due process if it is carelessly or deliberately pronounced on an extensive and materially false foundation which the defendant had no opportunity to correct. *Townsend*, 334 U.S. at 741; *see also United States v. Tucker*, 404 U.S. 443, 447 (1972); *United States v. Sammons*, 918 F.2d 592, 603 (6th Cir. 1990) (defendant must have a meaningful opportunity to rebut contested sentencing information). To prevail on such a claim, a petitioner must show that the court relied upon the allegedly false information. *United States v. Polselli*, 747 F.2d 356, 358 (6th Cir. 1984); *Draughn v Jabe*, 803 F. Supp. 70, 81 (E.D. Mich. 1992). Again, the petitioner makes no such showing. Rather, the record indicates that he had a sentencing hearing before the trial court with an opportunity to challenge the scoring of the offense variables and the accuracy of any information relied upon by the trial court. The petitioner, in fact, challenged the scoring of Offense Variable 14, albeit unsuccessfully. The petitioner fails to establish that the state trial court relied upon materially false or inaccurate information in imposing his sentence which he had no opportunity to correct. The court acted within its discretion at sentencing. Habeas relief is not warranted on this claim.

## V.       Conclusion

For the reasons stated, the court concludes that the petitioner is not entitled to federal habeas relief on the claims contained in his petition. Accordingly, the court **DENIES WITH PREJUDICE** the petition for a writ of habeas corpus.

Before the petitioner may appeal this decision, a certificate of appealability must issue. 28

U.S.C. § 2253(c)(1)(a); FED. R. APP. P. 22(b).  A certificate of appealability may issue "only if the applicant has made a substantial showing of the denial of a constitutional right."  28 U.S.C. § 2253 (c)(2).  This standard is met if the petitioner demonstrates that reasonable jurists would find the court's assessment of the claim debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484-85 (2000).  "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003).  A court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merits.  *Id.* at 336-37.

Having conducted the requisite review, the court concludes that the petitioner has not made a substantial showing of the denial of a constitutional right as to his claims.  Accordingly, the court **DENIES** a certificate of appealability.  The court also **DENIES** leave to proceed in forma pauperis on appeal as an appeal cannot be taken in good faith.  *See* FED. R. APP. P. 24(a).

**IT IS SO ORDERED.**

s/John Corbett O'Meara
United States District Judge

Date:  April 30, 2015

I hereby certify that a copy of the foregoing document was served upon the parties of record on this date, April 30, 2015, using the ECF system and/or ordinary mail.

s/William Barkholz
Case Manager